IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 24-14-03 |
| DERRELL JOHNSON | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Derrell Johnson helped Joseph Ruggiero file two fraudulent deeds for real estate located at 2324 Loney Street in Philadelphia (the "Loney Street Property") as part of a scheme to steal the property from its last owner's estate. As payment for this crime, Johnson received a check for $5,518 signed by Ruggiero's son-in-law, Jonathan Barger.

Johnson then helped Ruggiero and Barger defraud the City of Philadelphia out of property taxes that were due on the Loney Street Property. As payment for this crime, Johnson received a second check signed by Barger, this time for $5,000.

The FBI interviewed Johnson twice about his actions in support of both fraud schemes: once on October 14, 2020, and once on June 23, 2022. Both times, Johnson lied in an attempt to cover up his crimes. A grand jury indicted Johnson on two counts of violating 18 U.S.C. § 1001 based on the lies that Johnson told during the first interview, and a trial jury convicted him of both charges. The Presentence Investigation Report has correctly determined that Johnson's total offense level for his crimes is 14 and his criminal history category is I, which means that his sentencing range under the United States Sentencing Guidelines is 15-21 months' imprisonment. For reasons detailed below, a sentence at the top of that range would best serve the sentencing factors set forth in 18 U.S.C. § 3553(a).

1

## I. STATEMENT OF THE CASE

### A. Procedural History

On January 11, 2024, a federal grand jury sitting in the Eastern District of Pennsylvania returned a 12-count indictment against Barger, Alan Kane, and Johnson. Counts 5 and 6 charged Johnson with making false statements to the FBI, in violation of 18 U.S.C. § 1001. Barger pleaded guilty to the charges against him, while Kane and Johnson proceeded to trial.

On September 20, 2024, the jury convicted Kane and Johnson of all charges against them. Johnson, specifically, was convicted on Counts 5 and 6.

### B. Offense Conduct

#### 1. Background on the Loney Street Property

In 1961, Evelyn Kraftsow obtained title to the Loney Street Property. In December 1973, Mrs. Kraftsow transferred title from herself individually to herself and her husband, Edward Kraftsow, as tenants-by-the entireties. Evelyn and Edward Kraftsow had one son, William Kraftsow. For many years, the Kraftsow family lived at the Loney Street Property.

On August 3, 1977, Edward Kraftsow died, and title to the Loney Street Property passed back to Evelyn Kraftsow, who continued to live there. On January 1, 1997, Evelyn Kraftsow died, and title to the property passed to William Kraftsow, who continued to live there. On or about September 22, 2016, William Kraftsow died without leaving a will. William Kraftsow had no spouse, children, or siblings, but he had first cousins, and under Pennsylvania law, title to the Loney Street Property passed to those cousins when he died (the "Kraftsow family heirs").

One of William Kraftsow's cousins was Margery Bruck. Shortly after William Kraftsow died, Mrs. Bruck and her husband, Sanford Bruck, tried to settle the affairs of his estate. Among other things, the Brucks contacted the utility companies for the Loney Street Property, had the accounts changed to their names and address, and began paying the bills. Mr. and Mrs. Bruck also learned that William Kraftsow had fallen more than $20,000 behind on the property taxes he owed to the City of Philadelphia for the property. The Brucks hired a lawyer, Dan Rosin, who contacted City officials to delay a sheriff's sale of the property. The Brucks then began making plans to sell the Loney Street Property and use some of the proceeds to pay the property tax debt.

Before the Brucks could complete those plans, however, Ruggiero tried to steal the Loney Street Property through a title fraud scheme. Ruggiero was aided in his efforts by several people, including defendants Barger, Johnson, and Kane and men named Nathaniel Belton and Terrence Watson, who were referred to, respectively, as Persons A and B in the indictment.

### 2.    The Title Fraud Scheme

On May 23, 2017, Watson sent two emails to Johnson and attached to each email a draft of a fraudulent deed that purported to transfer ownership of the Loney Street Property from Evelyn Kraftsow to Ruggiero in exchange for $90,000. The first draft of the fraudulent deed was backdated to November 23, 2009, which was still more than 12 years after Mrs. Kraftsow's death. The second draft was backdated to November 23, 2012, more than 15 years after Mrs. Kraftsow's death.

Two days later, Belton intentionally recorded a fraudulent deed at Philadelphia City Hall purporting to transfer ownership of the Loney Street Property from Evelyn Kraftsow to a

3

fictitious person named "Antonio Rossi" on November 23, 2009, in exchange for $25,000. The fraudulent deed contained forged signatures of Mrs. Kraftsow and "Rossi," as well as a forged notary stamp and signature of a licensed notary, identified in the indictment as "P.G."

On June 9, Belton intentionally recorded a fraudulent deed that purported to transfer title to the Loney Street Property from "Rossi" to Ruggiero on June 7, 2017, in exchange for $15,000. This fraudulent deed contained forged signatures of "Rossi" and a notary identified in the indictment as "A.M.S-S." It also contained a forged notary stamp for A.M.S-S.

On the same day, June 9, 2017, Barger signed a check drawn on an account for Frankford Plating, which was made payable to Johnson in the amount of $5,518 for his participation in the title fraud scheme.

### 3. The Fraud Against the City of Philadelphia

By June 2017, the outstanding property tax debt owed for the Loney Street Property was approximately $27,964, and the City of Philadelphia had scheduled a sheriff's sale for July 2017. On June 28, 2017, Ruggiero, with the help of Barger, applied to the Philadelphia Department of Revenue for property tax relief through the City's Owner-Occupied Payment Agreement ("OOPA") program. This program allowed homeowners to restructure their property tax debts if they could demonstrate that they resided in the property and met certain financial requirements. Ruggiero's OOPA application falsely represented that Ruggiero lived at the Loney Street Property and that Ruggiero had a net monthly household income of $1,200.

To support this fraudulent application, Ruggiero and Barger provided the City with numerous documents purporting to show that Ruggiero lived at the Loney Street Property. One of those documents was a phony Philadelphia Gas Works ("PGW") bill that appeared to be

4

addressed to Ruggiero at the Loney Street Property. This bill, which was dated June 1, 2017, and covered the billing period of May 1 through 31, 2017, was created by Johnson, who altered an actual PGW bill that had been sent to him on the same date for the same billing period. Johnson also fabricated two earnings statements for Ruggiero from Frankford Plating in order to create the false impressions that Ruggiero lived at the Loney Street Property and his income was low enough to qualify for an OOPA agreement.

On June 30, 2017, the Philadelphia Department of Revenue approved Ruggiero's OOPA application and entered into an agreement with Ruggiero, pursuant to which the City agreed to waive all interest and penalties on the outstanding property taxes owed on the Loney Street Property and further agreed that going forward, Ruggiero would have to pay only $54 a month toward his property tax debt. On the same day, June 30, 2017, Barger signed a check for $5,000 that was made payable to Johnson as a payment for Johnson's participation in the fraud scheme against the City.

    **4.**    **Johnson's False Statements to the FBI**

On October 14, 2020, special agents of the FBI interviewed Johnson. After being shown copies of the fraudulent deeds purporting to transfer title to the property at 2324 Loney Street from Evelyn Kraftsow to Antonio Rossi and then from Antonio Rossi to Joseph Ruggiero, Johnson said that he did not recognize the deeds and had no involvement with the property, even though he had received the two emails from Watson which contained the drafts of the fraudulent deeds.

Additionally, Johnson was also shown copies of the two checks signed by Barger that were drawn on a Frankford Plating account made payable to him: one dated June 9, 2017, for

5

$5,518; and one dated June 30, 2017, for $5,000. Johnson told the agents that the checks were not really for him and that Barger told him to cash the checks and give the money to Juan Gonzalez, a former employee of Frankford Plating who was a close friend to Johnson. When asked why the first check was dated the same day that the fraudulent deed transferring title to the Loney Street Property to Ruggiero and the second check was dated the same day that Philadelphia approved Ruggiero's OOPA application, Johnson told the FBI agents that it was just a coincidence. Johnson then insisted that both checks were for Gonzalez instead of him, but he could not elaborate on why Barger would have been in such a rush to pay Gonzalez that Barger would have written the checks to Johnson. In reality, as Johnson well knew, Barger made both checks payable to Johnson because the checks were payments for Johnson's role in helping Ruggiero obtain title for the Loney Street Property and obtain approval for his OOPA application.

On June 23, 2022, FBI agents interviewed Johnson a second time. During this interview, Johnson repeated his lies that he had no involvement with the Loney Street Property and that the two checks from Barger were actually payments to Gonzalez. Johnson also was shown the PGW bill that he had altered to make it appear like it had been addressed to Ruggiero at the Loney Street Property, and said he had no involvement with the forged bill.

     **5.**    **Johnson's Claimed Memory Impairment**

Toward the end of his October 2020 interview by the FBI agents, Johnson said that he was suffering from a medical condition which caused him to have short-term memory loss. In his June 2022 interview, Johnson called his medical condition "MCI," which stood for Mild

6

Cognitive Impairment. At the trial, Johnson presented a defense based on a theory that the reason why he had made false statements to the FBI was because of his MCI.

Under this theory, when Johnson made the false statements, he was not intending to mislead the FBI; he had simply forgotten the truth. In other words, under the defense theory, when Johnson told the FBI on October 14, 2020, that "he did not recognize the fraudulent Loney Street Property deeds and had no involvement with the Loney Street Property," he had not necessarily lied: he might have just forgotten that he had received the emails from Watson containing drafts of the fraudulent deeds. Likewise, according to the defense theory, when Johnson told the FBI that the two checks signed by Barger to Johnson were actually intended for Gonzalez, he might have just forgotten that Barger had written the checks to Johnson as payments for Johnson's crimes.

The jury rejected this defense and convicted Johnson (and Kane) on all charges.

### 6. The Fraud Losses

Both of the fraud schemes in which Johnson participated caused actual financial harm to the victims. Shortly after Johnson cashed the two checks from Barger, Mrs. Bruck hired a lawyer who filed a complaint against Ruggiero and "Rossi" in an attempt to void their claims to own the Loney Street Property. Ruggiero and Barger hired Kane, and for several years, those three engaged in deceptive and fraudulent litigation tactics in an attempt to maintain Ruggiero's legal claim to the Loney Street Property or, at least, extract huge financial payments from the Kraftsow estate in exchange for the property.

The litigation started in the Philadelphia Court of Common Pleas, but in March 2019, Kane caused Ruggiero to file a bankruptcy petition in the United States Bankruptcy Court for the

7

Eastern District of Pennsylvania. Kane, Barger, and Ruggiero then committed a series of bankruptcy-related crimes in a further effort to defraud the Kraftsow estate.

In March 2021, Ruggiero's bankruptcy trustee sold the Loney Street Property. Gross proceeds from the sale were $266,000. The trustee then made a total of $105,927.89 in disbursements from those proceeds for expenses that included a commission to the real estate broker ($15,300), inheritance taxes ($38,250), back taxes owed to the City of Philadelphia ($46,252.54), and other costs and fees. The payment of these expenses left $160,072.11 in the estate. The trustee disbursed $31,582 of those proceeds to himself and his law firm and sent $212.98 to Atlas Acquisitions, LLC, which had asserted a claim against Ruggiero. The trustee sent the remaining funds – $128,277 – to Margery Bruck as administratrix of the Kraftsow estate, and she used all of this money to pay the lawyers who represented the estate against Kane and his clients. But for the defendant's crimes, the Kraftsow heirs would have been able to keep approximately $160,072.11.

The City of Philadelphia, which had been deprived of more than $27,000 as a result of the fraud committed by Ruggiero, Barger, and Johnson in Ruggiero's OOPA application – i.e., the scheme furthered in part by Johnson's doctoring of a PGW bill and fabrication of two Frankford Plating earnings statements – was able to recover most of its losses as a result of the sale of the Loney Street Property. Its continued losses after the sale and disbursement are approximately $2,239.67.

In sum, the total losses caused by defendant Johnson's fraud in this case are $162,311.78, of which $160,072.11 was incurred by the Kraftsow estate and $2,239.67 was incurred by the City of Philadelphia.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentence

Johnson is facing the following total statutory maximum sentence: Counts 5 and 6 (false statement to the FBI), 5 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment, on each count.

In total, therefore, Kane is facing a maximum possible sentence of 10 years' imprisonment, 3 years of supervised release, a $500,000 fine, and a $200 special assessment. Full restitution must also be ordered.

### B. Guidelines Calculation

The government agrees with the PSR's guidelines calculations. Under Section 3D1.2(d), Counts 5 and 6 are grouped together because the offense level for each is determined largely on the total amount of harm or loss. The applicable guideline for a violation of 18 U.S.C. § 1001 is U.S.S.G. § 2B1.1, and the base offense level for an offense that does not carry a maximum penalty of 20 years' imprisonment is 6, pursuant to U.S.S.G. § 2B1.1(a)(2). The combined actual loss to the Kraftsow estate and the City of Philadelphia is approximately $162,301.78. Under Section 2B1.1(b)(1)(F), a loss of more than $150,000 but not more than $250,000 results in a 10-level upward adjustment, which brings Johnson's offense level to 16.

Johnson meets the eligibility requirements under Section 4C1.1 for a two-level downward adjustment to 14. The PSR has correctly determined that Johnson has zero criminal history points, placing him in criminal history category I. With a total offense level of 14 and a criminal history category of I, Johnson's range under the guidelines is 15-21 months' imprisonment.

### III. ANALYSIS

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted), *cited favorably in United States v. Friedman*, 2011 WL 4470674, at *14 (3d Cir. Sept. 28, 2011); *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006). In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (*en banc*).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a

10

ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *Cooper*, 437 F.3d at 329; *see also Rita v. United States*, 127 S. Ct. 2456, 2468 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Schweitzer*, 454 F.3d 197, 205-06 (3d Cir. 2006).

As indicated above, the defendant's properly calculated advisory sentencing range under the current guidelines is 15-21 months' imprisonment. A sentence at the top of that range would best serve the sentencing factors set forth in 18 U.S.C. § 3553(a). Those factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[1]

---

[1] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that

11

Sections 3553(a)(4) and (a)(5) specifically direct the Court to consider the applicable guidelines and commentary, and Section 3553(a)(6) commands that the Court strive to avoid disparity in sentencing among similarly situated defendants. Collectively, therefore, they counsel for the imposition of a within-Guidelines sentence of 15-21 months' imprisonment. The nature and circumstances of the defendant's offenses, and Johnson's particular history and characteristics support the imposition of a sentence at the top of that range.

Johnson's conduct in this case was consistently deceptive and dishonest. First, he helped Ruggiero record two fraudulent deeds for the Loney Street Property, based on the drafts of the deeds that Johnson had received in the emails from Watson. Then Johnson altered a PGW bill that he had received to make it look like the bill had been sent to Ruggiero at the Loney Street Property. Johnson also created two bogus earnings statements from Frankford Plating to Ruggiero to make it appear like Ruggiero satisfied both the residency and income requirements to be eligible for property tax relief under Philadelphia's OOPA program. Johnson then lied to the FBI in two separate interviews and feigned a medical impairment to give himself an excuse for lying to the FBI.

A sentence at the top of Johnson's 15-21-month imprisonment range would also promote respect for the law and provide just punishment for Johnson crimes. Such a sentence would serve the sentencing goals of general and specific deterrence. It would send a message to other people

---

the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (quoting *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

in Johnson's position that severe consequences await them if they commit fraud and lie to the FBI, and it would limit Johnson's ability to engage in any more deceptive and dishonest conduct during his period of incarceration.

The sentencing goal of providing Johnson with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, id. § 3553(a)(2)(D), is not applicable in this case.

## IV.   CONCLUSION

For all the foregoing reasons, the government respectfully requests that this Court sentence Johnson to a term of imprisonment at the top of his 15-21-month range under the Guidelines. Additionally, the government asks this Court to order Johnson to pay a within-Guidelines fine of between $7,500 and $75,000,[2] and full restitution to both the Kraftsow estate ($160,072.11) and the City of Philadelphia ($2,239.67) as a condition of a 3-year term of supervised release.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Mark B. Dubnoff*
MARK B. DUBNOFF
Assistant United States Attorney

---

[2] Johnson clearly has the financial means to pay this fine as demonstrated by the motion he filed on December 26, 2024, to modify the conditions of his release, in which Johnson sought permission from the Court to take his wife to the Bavaro Princess Resort in Punta Cana, Dominican Republic, from January 10, 2025, to January 13, 2025.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Government's Sentencing Memorandum was served by email upon Rhonda Lowe, counsel for the defendant.

Date: April 24, 2025                              */s/ Mark B. Dubnoff*
                                                              MARK B. DUBNOFF